UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| UNITED STATES OF AMERICA | § | |
|---|---|---|
| | § | |
| v. | § | |
| | § | Criminal No. 4:15-CR-00591-2 |
| MARIE NEBA, | § | |
| Defendants. | § | |

**UNITED STATES' RESPONSE IN OPPOSITION TO
MARIE NEBA'S MOTION FOR REDUCTION OF SENTENCE**

COMES NOW, the United States of America, by and through its undersigned counsel, and files this response in opposition to Marie Neba's ("Neba") motion for a reduction in sentence under the First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i) (the "Act"). In her motion, Neba argues that she should be released from prison approximately 868 months—over 72 years—early because she has a terminal illness and because a caregiver for her children is now incapacitated. Indeed if Neba's motion is granted, the Court would be releasing her five years before the sentence that she requested, and the Court rejected, at sentencing. The Court should deny Neba's motion.

Neba has not met her burden to establish that extraordinary and compelling reasons warrant her release, nor that release is warranted in light of the 18 U.S.C. § 3553(a) factors and applicable policy statements issued by the Sentencing Commission. Neba's motion rehashes arguments that were considered and rejected by both the Court at sentencing and the Fifth Circuit and does not present new facts or changed circumstances to the Court. The jury found that Neba orchestrated an extensive fraud with her husband, Ebong Tilong ("Tilong"), and others, using their fraudulent home health agency, Fiango Home Healthcare Inc. ("Fiango"). At sentencing, the Court determined that Neba obstructed justice while her case was pending and sentenced her to 900 months in custody. Neba has not met her burden to demonstrate that she should be released having

1

served only four percent of her sentence.

## I. Procedural and Factual Background

Neba was the co-owner and director of nursing of Fiango, which she and Tilong operated in in Houston, Texas. Neba, Tilong, and their co-conspirators submitted over $13 million of false and fraudulent claims to the Medicare Program ("Medicare") that were the result of illegal kickbacks payments or were for services that Fiango did not provided or that Fiango's patients (also referred to as "beneficiaries") did not need.

As a result of their fraudulent conduct, on November 5, 2015, a grand jury indicted Neba, along with Tilong and two of their co-conspirators, with (a) one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349; (b) three counts of healthcare fraud, in violation of 18 U.S.C. §§ 1349 and 2; (c) one count of false statements relating to healthcare matters, in violation of 18 U.S.C. §§ 1035 and 2; (d) one count of conspiracy to pay and receive healthcare kickbacks, in violation of 18 U.S.C. § 371; (e) one count of payment and receipt of healthcare kickbacks, in violation of 42 U.S.C. § 1320a-7b(b)(1) and (b)(2) and 18 U.S.C. § 2; and (f) one count of conspiracy to launder money, in violation of 18 U.S.C. § 1956(h). Dkt. 1.

Following her indictment, Neba began obstructing the prosecution of her case. For instance, during a court appearance, Neba pressured one of her co-defendants, Daisy Carter ("Carter"), who bribed Medicare beneficiaries to participate in Neba's fraud scheme, to lie to the United States and the trial court about the fraud that she committed with Neba and Tilong at Fiango. Outside the courtroom at Carter's second post-arrest court appearance, Neba and Tilong sat next to Carter, placing Carter between them. Trial Transcript of November 11, 2016 at 49. Neba then instructed Carter "[t]o keep [Carter's] story the same. . . . Not to tell anybody that [Carter] was paying patients." *Id*. at 49-50, 56-57. At sentencing, the Court relied on this conduct

2

to impose the obstruction of justice enhancement on Neba at sentencing.

In addition to trying to convince Carter to perjury herself, Neba and Tilong delayed their trial by approximately a year by continually changing defense counsel and moving for continuances of their trial date. In fact, on the eve of their October 31, 2016 trial date, Neba and Tiling moved to replace their trial counsel with new counsel—a motion that, if granted, would have delayed Neba's trial date by several more months. Dkt. 45-46, 48-52, 54, 56-57, 68-69, 76, 88-89.[1]

Neba and Tilong began trial on November 1, 2016. During the trial, the jury heard overwhelming evidence that Neba and Tilong paid illegal kickbacks and bribes and fraudulently billed Medicare approximately $13,203,676 in claims. Dkt. 159. Mid-way through trial, both Neba and Tilong advised the trial court that they wished to plead guilty, but during Neba's change of plea hearing, she was "unable to recite to the Court what she did wrong in connection with her plea of guilty as to the counts in the Indictment," prompting trial court to terminate her change of plea hearing and continue the trial. November 8, 2016 Minute Entry.

At trial, Neba testified in her own defense and provided demonstrably false and misleading testimony that was not credited by either the jury or the Court. November 9, 2016 Minute Entry; *see also* Dkt. 182 at 5-6 (listing false representations by Neba to the Court). The jury found Neba guilty of all of the counts in the Indictment, and the trial court remanded her into custody immediately following trial. Dkt. 117.

After her conviction, Neba attempted to obtain release from custody, again replaced her counsel, moved to extend the deadlines for post-trial her briefing, and moved to continue her

---

[1] Approximately five days before Neba was scheduled to begin her October 31, 2016 trial, she moved to replace her trial counsel with a new attorney. Dkt. 94-95, 100. Neba first advised the United States of her intent to substitute counsel on approximately October 24, 2016, but she waited approximately three full days before she filed her motion to substitute. Dkt. 96.

sentencing hearing. Dkt. 130, 132, 134-135, 138. She first filed a motion for release pending sentencing citing her need to see her own doctor for treatment of her hypothyroidism, vitamin deficiency, and hypertension. Dkt. 140, 140-5. Neba then filed a second motion seeking release asserting that her treatment for type-two diabetes, hypothyroidism, and hypertension was inadequate and asking the trial court to allow her to be treated by her own doctor. Dkt. 147 at 2-3. In the alternative, Neba requested the trial court transfer her to a BOP medical facility for specialized care. Dkt. 147 at 3; Dkt. 148. The Court denied Neba's motion, but directed Neba to contact and explain her concerns to BOP and directed BOP doctors "to evaluate [Neba's] condition and take steps necessary to insure that she is being care for adequately." Dkt. 150.

At sentencing and in her sentencing papers, Neba asked the Court to grant a downward departure and impose a variant sentence of between 84 and 96 months imprisonment based, among other things, on Neba's recent cancer diagnosis, need for effective medical care from outside of BOP, and family circumstances. Dkt. 181 at 3, 7-12.[2] Neba informed the Court prior to sentencing that in May 2017, she was diagnosed with breast cancer. According to Neba, the U.S. Marshal's Service sent Neba's biopsy results to MD Anderson "as soon as [the U.S. Marshal's Service] received them," but the U.S. Marshal's Service would not sign MD Anderson's financial responsibility form. *Id.* at 7-9. Neba acknowledged that the U.S. Marshal's Service rarely signed such forms because the forms "unnecessarily assign[ed] responsibility where it ha[d] already been assumed by the government." *Id.* at 7-9. Instead, Neba stated that an oncologist at Harris County Medical Center evaluated her and provided her with a long-term treatment plan. *Id.* at 9.

Neba also claimed in her sentencing papers that she was entitled to a variant sentence because a long term of imprisonment "would certainly guarantee that her young children would

---

[2] Neba also argued that her diabetes, hypertension, and hypothyroidism justified a variant sentence. Dkt. 181 at 7.

4

not be able to spend time with their seriously ill mother in possibly the last years of her life." *Id.* at 11. Neba argued that the sentencing court should impose a 84- to 96-month term of imprisonment because Tilong faced a custodial sentence and neither she nor Tilong had "any living parents to assist with their children should both [Neba and Tilong] be sentenced to long terms"—a claim directly contradicted by Neba's instant motion in which she asks the Court to grant her relief under the Act because her children's "paternal grandmother," who has been caring for them, "must return to Africa." Dkt. 181 at 11 and 313 at 8, 12, 14.

Aware of Neba's terminal cancer and childcare issues, the Court at sentencing nevertheless imposed a sentence of 900 months imprisonment, three years of supervised release, and an $800 special assessment. The Court also ordered Neba to make over $13.2 million in restitution to Medicare, Dkt. 208, and entered a money judgment in the same amount, Dkt. 159.

Neba appealed her sentence. Dkt. 201. Neba argued, among other things, to the Fifth Circuit that the sentencing court imposed a substantially unreasonable sentence because it failed to consider that Neba was the "mother to two small children, and her children would become orphans when both [Neba] and [Tilong were] sentenced," and that Neba was "diagnosed with stage four breast cancer" that had "metastasized to both her bones and lungs." Opening Appellant Brief, *United States v. Neba*, No. 17-20520, 2017 WL 6496289 at *12 (5th Cir. December 4, 2017). To emphasize her predicament, Neba pointed out to the Fifth Circuit that at sentencing, her counsel "asked the judge to consider that a sentence of several years would undoubtedly mean that [Neba] would die in prison and have harsh effects on her young children." *Id.* at *12-13.

The Fifth Circuit rejected Neba's arguments and affirmed her sentence, holding, in relevant part:

> Neba argues that her sentence is effectively a life sentence, and a life sentence is disproportionate to a nonviolent, first offense. Neba is currently fifty-four years

5

old.  Therefore, a seventy-five year sentence is equivalent to a life sentence.  This is particularly apparent given Neba's current medical state.  *We are sensitive to the fact, as the district court was, that Neba is currently receiving treatment for metastasized breast cancer.  However, that does not change the fact of her crimes, and the legal system mandates that those criminally liable receive just punishments.  Here, Neba participated as a leader in a prolonged, extensive Medicare fraud scheme, defrauded Medicare of over $13 million dollars, and procured the involvement of numerous outside individuals to participate in her scheme.*  Although seventy-five years is a severe sentence, we cannot say that Neba's crime was not grave enough that the sentence is grossly disproportionate to her crime.

*United States v. Neba*, 901 F.3d 260, 264-65 (5th Cir. 2018) (internal citations omitted) (emphasis added), *cert. denied*, 139 S.Ct. 1322 (March 18, 2019).

Before and after Neba filed her appeal, she asked the BOP for compassionate release on three occasions, arguing that she should be released because of (1) a debilitated medical condition, (2) a terminal illness, and (3) the incapacitation of a family member caregiver.  Dkt. 313-1.  BOP denied her requests on April 27, 2018, December 27, 2018, and January 22, 2019, respectively.  *Id.*  While Neba did not exhaust all her administrative remedies through the Administrative Remedy Program, more than thirty days have elapsed since receipt of these requests by the warden of the BOP medical facility where Neba is housed.  *See* 18 U.S.C.A. § 3582(c)(1)(A).

## II.     Legal Standard

The Act, as amended by Congress on December 21, 2018,[3] permits BOP or the defendant, once the defendant has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," to petition the Court for compassionate release.  18 U.S.C.A. § 3582(c)(1)(A).  The Court may to reduce the imprisonment term and may impose a term of probation or supervised release.  *Id.*  To grant such a motion pursuant to 18 U.S.C.

---

[3] Prior to the December 21, 2018 amendment, only BOP was permitted to file a motion in the district court for compassion release under the Act.

§ 3582(c)(1)(A)(i), the Court first considers the 18 U.S.C. § 3553(a) factors, and after doing so, must find that (1) "extraordinary and compelling reasons warrant such a reduction" and (2) "a reduction is consistent with applicable policy statements issued by the Sentencing Commission" in section 1B1.13.  18 U.S.C. § 3582(c)(1)(A).

The applicable policy statements issued by the Sentencing Commission reiterates the requirements of 18 U.S.C. § 3582(c)(1)(A) and adds that the Court should only grant compassionate release if "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13.  The commentary to U.S.S.G. § 1B1.13 sets forth several possible bases for a finding of extraordinary and compelling circumstances:  a terminal illness; a serious medical condition "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover"; the defendant "is at least 65 years old," "is experiencing a serious deterioration in physical or mental health because of the aging process," and "has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less"; or "the death or incapacitation of the caregiver of the defendant's minor child or minor children" or "the incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner."  The commentary and 18 U.S.C. § 3582(d)(1) define a terminal illness as "a serious and advanced illness with an end of life trajectory."  U.S.S.G. § 1B1.13.

The amended Act also requires BOP to provide notice to the inmate's attorney, partner, and family members of a terminal diagnosis not later than 72 hours after the diagnosis and to assist inmates with a terminal diagnosis in filing a motion for compassionate release.  18 U.S.C. § 3582(d)(2)(A) and (B).

### III. Argument

#### A. The Section 3553(a) Factors Require the Court to Deny Neba's Motion

Neba's motion is a third bite at the apple to make arguments made to both the Court at sentencing and the Fifth Circuit. The Court does not need to reach whether "extraordinary and compelling reasons" exist to grant to Neba's motion because as both the Court at sentencing and the Fifth Circuit found, *none* of the section 3353(a) factors support reducing Neba's sentence or releasing her from custody.

##### 1. The nature and circumstances of Neba's offense and her history and characteristics

###### *a. Nature and circumstances of the offense*

The sentence imposed by the Court at sentencing and affirmed by the Fifth Circuit reflects Neba's central role in the $13 million healthcare fraud conspiracy. As an owner and director of nursing of Fiango, Neba fabricated—and directed others to fabricate—medical records for Medicare beneficiaries who did not need and did not receive home health services. Neba did so to justify fraudulent claims to Medicare and thereby enrich herself and her co-conspirators. Neba directed others to pay bribes to Medicare beneficiaries to allow Fiango to use the beneficiaries' information to bill Medicare for services that Neba and her co-conspirators never rendered to the beneficiaries and/or that were not medically necessary. Moreover, in many cases, the beneficiaries who Neba and her co-conspirators used to defraud Medicare were vulnerable people. These beneficiaries were elderly, poor, or both and were susceptible to being bribed by Neba and her co-conspirators to obtain extra money to support themselves.

In addition, Neba abused her position of trust as medical professional and used her license as a nurse practitioner to admit beneficiaries to Fiango who did not qualify for home health services, and to exaggerate the severity of the beneficiaries' medical conditions to fraudulently

increase her payments from Medicare. Neba then used the money that she and her co-conspirators stole from Medicare to further the fraud at Fiango with more bribes and kickbacks and to live a lifestyle that she would not have been able to otherwise afford.

### b. Neba's history and characteristics

Neba's "history and characteristics" also support denying her motion. Neba is well educated and was a nurse practitioner. She has a Bachelor of Arts Degree in French from the University of Minnesota, Bachelor of Science Degree in nursing from the University of Texas Medical Branch, and a Master's of Science Degree in nursing from Texas A&M Corpus Christi. PSR ¶¶ 110-11. Rather than using her knowledge and skills to earn an honest and legitimate living, Neba chose to use vulnerable beneficiaries, her nursing license, and her medical training to defraud Medicare. Neba's criminal conduct was fueled by greed, not desperation. *See United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) ("Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime."). Her crimes were not limited to a few instances of using vulnerable beneficiaries, paying kickbacks, or submitting false claims. She made the repeated choice to commit fraud every day for years, submitting thousands of claims for hundreds of beneficiaries.

Neba demonstrated a character for dishonesty by attempting to obstruct justice, engaging in dilatory tactics, and lying and misleading the trial court and the jury during her testimony. As the Supreme Court has noted, "[t]he commission of perjury . . . reflects on a defendant's criminal history, on her willingness to accept the commands of the law and the authority of the court, and on her character in general." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

Importantly, since being sentenced, the United States has obtained evidence that Neba has

committed new crimes, showing that she suggesting that she has not rehabilitated during her short time in custody.[4] Neba's actions during her case and failure to accept responsibly for her actions weigh in favor of denying her motion and requiring her to serve the sentence imposed by the Court and affirmed by the Fifth Circuit.

> 2. The need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence; (C) to protect the public from further crimes of the defendant; and (D) to provide defendant with appropriate education or vocational training and medical care

Healthcare fraud is a damaging offense, individually and nationally. In 2017, Medicare spending grew by 4.2% to $705.9 billion, constituting twenty percent of national healthcare expenditures. Estimates show that as much as twenty percent ($100 billion) of that Medicare expenditure was lost to healthcare fraud, like the crimes that Neba was convicted of in this case. What is more, home health care fraud has been a major driver of that loss in the Southern District of Texas. There is a need for deterrence.

As the United States noted in its sentencing papers, during Neba's healthcare fraud conspiracy, the per-person healthcare spending for the 65 and older population was approximately $19,000 annually.[5] Thus, rather than unwittingly paying Neba and her co-conspirators for fraudulent claims, Medicare could have spent these funds to cover a year of legitimate care for over 600 Medicare-eligible Americans.

The sentence imposed by the Court at sentencing signaled to the healthcare fraud community in Houston and elsewhere that the courts in this district will not tolerate Medicare fraud and will levy significant penalties on those who do. Releasing Neba from custody approximately

---

[4] Should the Court want further detail about the evidence of continued criminal conduct, the United States will disclose those details to the Court in an *ex parte*, *in camera* filing.
[5]*See* https://www.cms.gov/research-statistics-data-and-systems/statistics-trends-and-reports/nationalhealthexpenddata/nhe-fact-sheet.html (last visited on July 10, 2019).

2.5 years into her prison sentence, and five years before she has served the sentence that she requested in her sentencing papers, will undermine the powerful deterrent affect that her sentence can have on others. The sentence imposed by the Court and affirmed by the Fifth Circuit sends a message of deterrence and, as the Fifth Circuit held, properly reflects the serious impact of Neba's crime on Medicare, the taxpayers, and those who depend on Medicare.

        3.        <u>The sentencing range established by the Guidelines</u>

As the Fifth Circuit affirmed, the sentence imposed by the Court was within a properly-calculated Guidelines range. *See United States v. Neba*, 901 F.3d 260, 263 (5th Cir. 2018) ("Neba's Guidelines range provided for up to a life sentence, limited to 900 months as the statutory maximum. Thus, her 900-month sentence was within the Guidelines range").

        4.        <u>The need to avoid unwarranted sentencing disparities among defendants with similar records</u>

Neba's sentence did not create unwarranted sentencing disparities among similarly situated defendants. Tilong's sentence was greater than Neba's, reflecting his criminal conduct in both this case and the criminal tax case. The Court sentenced Carter and Neba's other co-defendant, Connie Ray Island ("Island"), to lesser sentences because it recognized that they were less culpable than Neba: Carter and Island were patient recruiters. They did not own Fiango or orchestrate the fraud at Fiango. They did not lie under oath. They did not attempt to suborn perjury. They did not sign the Medicare application, promising to follow the Medicare rules and federal law. They did not betray an oath as a medical practitioner. They did not pay bribes to doctors. They did not control the Fiango bank accounts. They did not fabricate medical files or direct others to fabricate medical files. They did not reap millions from the fraud and live an affluent lifestyle supported by the proceeds of the fraud. Unlike Neba, Island and Carter accepted responsibility for their crimes and attempted to make amends for their criminal conduct by cooperating with the United States and

11

assisting it in Neba's prosecution.

     5.    <u>The need to provide restitution to any victims of the offense</u>

To date, Neba has made little, if any, restitution to Medicare. Neba has made no showing that she will make efforts to abide by the Court's monetary judgment and restitution order and repay Medicare the millions of dollars she defrauded from it. This factor, along with the other section 3553(a) factors, require the Court to deny Neba's motion.

    **B.**    **Neba Has Not Shown that Extraordinary and Compelling Reasons Warrant Releasing Her from Custody**

In addition to failing to demonstrate that relief is appropriate under the section 3553(a) factors, Neba has not demonstrated that extraordinary and compelling reasons warrant her release. Neba has served only approximately 32 months of her sentence. Instead, Neba has cited circumstances that the Court at sentencing and the Fifth Circuit already took into account when determining and affirming her sentence. She has not served the low end of the 84- to 96-month term of imprisonment that she requested at sentencing. Granting Neba's request for release would result in her serving five fewer years in custody than she thought was appropriate at sentencing and decades before the end of her original sentence.

     1.    <u>The Court and Fifth Circuit were aware of Neba's terminal illness at the time they imposed and affirmed Neba's sentence</u>

Neba argues that the Court should reduce her sentence because she has a "confirmed diagnosis of metastatic breast cancer that has spread to her bones," and this form of cancer requires prompt medical treatment. Dkt. 313 at 7-8. The United States does not dispute that Neba very unfortunately has cancer, but this not new information. Both the Court at sentencing and the Fifth Circuit were aware and considered that Neba suffered from a serious and even terminal form of cancer. Indeed both specifically addressed the issue when ruling. Dkt. 210 at 33 ("She has been

recently diagnosed with breast cancer while she was in custody, and is receiving chemotherapy treatments."); *Neba*, 901 F.3d at 264-65 ("We are sensitive to the fact, as the district court was, that Neba is currently receiving treatment for metastasized breast cancer."). In spite of this information, both courts rejected Neba's arguments to reduce her sentence.

The two cases Neba cites in her brief, *United States v. Wadena*, 470 F.3d 735 (8th Cir. 2006), and *United States v. Pesterfield*, No. 3:14-CR-14-TAV-HBG-1, Dkt. 256 (E.D. Tenn., May 6, 2019), do not provide a basis to second guess the rulings of the Court at sentencing or the Fifth Circuit. *Wadena* did not involve a post-sentence petition for compassionate release. On direct appeal, the United States argued that the district court abused its discretion at sentencing because the extent of (but not fact of) the district court's downward departure at sentencing was unreasonable. *Wadena*, 470 F.3d at 736. This motion involves a completely different standard of review and procedural posture. Here, Neba bears the burden of demonstrating that extraordinary and compelling reasons exist to warrant a reduction in her sentence and release. During sentencing, Neba cited her cancer as a reason she should receive a lower sentence and that argument was rejected by the Court. *See* Dkt. 208. Then the Fifth Circuit determined that the district court properly used its discretion and affirmed Neba's within-Guidelines sentence.

In *Pesterfield*, the district court granted a motion for compassionate release because the defendant had served five years of her seven-year prison sentence, would have been eligible for release that year if her illness had not prevented her from completing BOP's Residential Drug Abuse Program, completed several programs and obtain her G.E.D. while incarcerated, and was largely confined to a bed and wheelchair. No. 3:14-CR-14-TAV-HBG-1, Dkt. 256 at 3-4. By comparison, Neba has served a small fraction of her 900-month sentence, has offered no evidence of rehabilitation during her short time in custody, and is able to engage in daily living activities.

13

*See* Sealed Exhibit C at 1. The Act does not require courts to reduce an inmate's sentence or release the inmate from custody in all cases in which a defendant suffers from a terminal illness.

        2.      <u>Neba is receiving proper care for her medical conditions</u>

Contrary to the conclusory allegations in Neba's motion, the BOP is providing her with the medical care she needs. Neba was taken into custody in November 2016. While in the custody of the U.S. Marshal's Service, Neba was scheduled for a mammogram on January 20, 2017, but refused the offsite appointment. *See* Sealed Exhibit A. Another offsite mammogram was scheduled in April 2017. Following that mammogram, an offsite biopsy was performed in May 2017. Neba was diagnosed with cancer in mid-May 2017. Dkt. 181 at 8. By Neba's own admission, once she was diagnosed with cancer, the U.S. Marshal's Service immediately contacted MD Anderson, and then scheduled her for treatment with an oncologist at Harris County Medical Center. *Id.* at 8-9.

After beginning chemotherapy treatment, Neba was transferred to FMC Carswell, a facility for female offenders in need of specialized medical and mental health services. FMC Carswell is fully accredited by the Joint Commission for Ambulatory Care, Behavioral Health Care, and as a Nursing Care Center. If FMC Carswell cannot provide services in house, it has a comprehensive medical contract with the University of North Texas Health Sciences Center in Fort Worth, Texas ("UNT") to provide comprehensive medical care to its inmates. In accordance with the contract, UNT provides a wide variety of medical services to FMC Carswell inmates, including, but not limited to: oncology, chemotherapy and radiation, neurology, nephrology, cardiology, infectious disease, dermatology, rheumatology, and orthopedics.

Once transferred to FMC Carswell, Neba has received treatment onsite from the oncology, chronic care, and nephrology clinics. *See* Sealed Exhibit B (an example of Neba's BOP medical

records). She has received physical therapy, care from a cardiologist, pain management treatment, access to psychology services, optometry exams, patient education to ensure that she understands her medical conditions, and approval for diabetic toenail care assistance. She also has received various types of medical treatment, including injections, chemotherapy, the cancer medication (Taxol), and a number of other medications. *See id.* (describing some of her care and listing her medications). Neba also met with a social worker regarding child care concerns. *See* Sealed Exhibit C.

Neba has offered no evidence that BOP cannot provider her the medical care she needs. Neba does not point to any specific treatment options that she has been denied or applicable clinical trials she currently is being excluded from. *See* Dkt. 313 at 11.

> 3. The incapacitation of the woman caring for Neba's children is not "an extraordinary and compelling reason" to reduce Neba's sentence or release her from custody

Neba has not establish that extraordinary or compelling circumstances exist based on her childcare situation to warrant release after she has served less than four percent of her sentence. Neba argues that her children's caregiver, Grace Ndikum, has become incapacitated and that "[t]here is no one else to care from the minor children." Dkt. 313 at 8-9. Neba also claimed that the children's "paternal grandmother," Ms. Tiza, had been caring for children while Neba was incarcerated. Dkt. 313 at 8, 12, 14. First, this contradicts Neba's representation to the Court at sentencing that neither she nor Tilong had living parents who could care for their children. Dkt. 181 at 11.

Second, contrary to Neba's motion there are, in fact, members of Neba's immediate and extended family who can care for her children while she serves her prison sentence. Neba has a

15

college-aged daughter Claudel and two of Tilong's siblings, Denis and Isidore, live in Minnesota.[6] When she requested compassion release from BOP, she informed BOP that she could live with her brother-in-law Evo in Texas if released and could get assistance from her sister-in-law Claudette. Sealed Exhibit C at 1. Additionally, Neba could rely on the family friends who are currently looking after her children. Dkt. 313 at 14. Neba explained in her motion that it is her intention that she would live with these family friends if she is released. *Id.* The Court does not need to reduce Neba's sentence or release her from custody to provide her children with a caretaker.

### 4. 1B.1.13 Policy Statement: Defendant is a danger to the community

Neba argues that she is not a danger to the community because she suffers from cancer and no longer possesses a nursing license or Medicare number. Dkt. 313 at 13. However, Neba presents a danger to the community because of her ability to cause economic harm. *See United States v. Reynolds*, 956 F.2d 192, 192 (9th Cir. 1992) (denying defendant release on bond pending appeal because of the economic danger defendant posed to the community and holding that "danger may, at least in some cases, encompass pecuniary or economic harm." (citations omitted)); *United States v. Parr*, 399 F. Supp. 883, 888 (W.D. Tex. 1975) ("The 'danger to . . . the community' provision of 18 U.S.C. § 3148 permits consideration of the defendant's propensity to commit crime generally, even where only pecuniary and not physical, harm might result to the community at large." (citation omitted) (alteration in original)). If released from custody, Neba will not be able to return to work as a nurse practitioner to support herself. The facts surrounding Neba's conviction show that she has the knowledge and ability steal millions of dollars from a government program. Numerous fraudulent home health agencies and other healthcare providers continue to operate in the district. Additionally, as discussed above, the United States has received

---

[6] Tilong also has siblings in Cameroon and the United Kingdom.

evidence that Neba has continued to commit crime while she has been serving the sentence she now asks the Court to reduce.

## IV. Conclusion

For the reasons stated above, the Court should deny Neba's motion.

Date: July 11, 2019

Respectfully submitted,

RYAN K. PATRICK
United States Attorney

By: /s/ Jonathan Baum
Jonathan Baum
Senior Trial Attorney
United States Department of Justice
Money Laundering and Asset Recovery Section,
Criminal Division
1400 New York Avenue, NW, 9th Floor
Washington, DC 20005
Jonathan.Baum@usdoj.gov
(202) 230-8655

/s/ Catherine Wagner
Catherine Wagner
Trial Attorney
United States Department of Justice
Fraud Section, Criminal Division
1000 Louisiana Street, Suite 2300
Houston, Texas 77002
Catherine.Wagner@usdoj.gov
(202) 794-0097

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2019, a true and correct copy of the foregoing response in opposition was served on Marie Neba's counsel of record via the Court's Electronic Case File system.

/s/ Catherine Wagner
Catherine Wagner
Trial Attorney